# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **JANELLE PEARL TAYLOR,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. CIV-18-186-RAW-SPS |
| ) | |
| **COMMISSIONER of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

The claimant Janelle Pearl Taylor requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons set forth below, the Commissioner's decision should be REVERSED and the case REMANDED to the ALJ for further proceedings.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy[.]" *Id.* § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."

---

[1] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

### Claimant's Background

The claimant was forty-seven years old at the time of the administrative hearing (Tr. 270, 301). Her education includes up to two years of college, and she has worked as a door-to-door salesperson, home health aide, kitchen aide, and kennel attendant (Tr. 253, 482). The claimant alleges she has been unable to work since January 1, 2013, due to major depressive disorder, chronic fatigue, microvalve prolapse, high blood pressure, anxiety, fibromyalgia, chronic pain, anxiety about being in public, sleep apnea, chronic back and knee pain, obesity, tachycardia, and thyroid problems (Tr. 481).

### Procedural History

The claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85, on November 3, 2015. Her applications were denied. ALJ Luke Liter held an administrative hearing and determined that the claimant was not disabled in a written opinion dated July 14, 2017 (Tr. 242-255). The Appeals Council denied review, so the ALJ's written opinion is the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

### Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), *i. e.*, she could lift/carry/push/pull twenty

pounds occasionally and ten pounds frequently, sit for six hours in an eight-hour workday, and stand/walk up to six hours in an eight-hour workday, with the additional limitations of only occasionally climbing ramps/stairs, balancing, kneeling, stooping, crouching, and crawling, as well as avoiding climbing ladders/ropes/scaffolds.  He further found that she could not tolerate exposure to hazards such as unprotected heights or dangerous moving machinery.  He imposed the psychologically-based limitations that the claimant could understand, remember, and carry out simple and some complex tasks, but that tasks should be repetitive and routine, and that she should avoid contact with the public while contact with supervisors and co-workers should be superficial, defined as brief and cursory (Tr. 246-247).  The ALJ then concluded that the claimant was not disabled because there was work she could perform, *e. g.*, housekeeper, electronics assembler, and packer inspector (Tr. 253-255).

## Review

The claimant contends that the ALJ erred by failing to properly evaluate her mental impairments, specifically with regard to the opinions of consultative examiner Dr. Theresa Horton, and counselor Marva Heissmann, LPC, LMFT, RN, and that her mental impairments preclude her from maintaining a job or performing substantial gainful activity. The undersigned Magistrate Judge agrees that the ALJ failed to properly evaluate the evidence of record, and the decision of the Commissioner should therefore be reversed.

The ALJ found that the claimant had the severe impairments of unspecified personality disorder, depressive disorder, obesity, and chronic pain (Tr. 244). The medical evidence related to the claimant's mental impairments reveals that she received counseling

-4-

for a number of years and was hospitalized on at least two occasions for suicidal ideation. Treatment records from the claimant's counselor indicate she was largely treated at Redbird Smith Health Center by Nurse Practitioner Melissa Horn and Licensed Professional Counselor Marva Heinemann. Treatment notes with Nurse Practitioner Horn indicate the claimant was homeless in March 2013, and that she went in crying and "out of control" (Tr. 631). Ms. Heinemann accepted her for therapy that month, noting that the claimant had signs and symptoms for depression and anxiety, and that she needed to be referred for additional management of psychotropic medications (Tr. 710). She would be hospitalized much of the following month due to her mental health problems.

On April 8, 2013, the claimant was hospitalized for twelve days at Parkside Psychiatric Hospital & Clinic after being voluntarily admitted on referral from her therapist due to worsening depressive symptoms and suicidal ideation (Tr. 596). She was discharged on April 20, 2013, and discharge notes state that it took "extensive efforts in both medication management and psychotherapy programming to begin to see improvement" in her mood (Tr. 596). The patient was discharged after help with her homelessness had been addressed, with discharge diagnoses of major depressive disorder, recurrent, severe, without psychosis, as well as early onset dysthymic disorder (Tr. 597). She was given a fair prognosis, even assuming compliance with her treatment recommendations, and was discharged to the Tulsa Day Center for the homeless (Tr. 597).

Following her hospitalization, the claimant continued to be positive for anxiety and depression, and also reported anxiety and panic attacks (Tr. 638-655). Treatment notes from Ms. Heinemann upon her discharge indicated little insight into her situation, and a

-5-

reflection that the claimant had been "out of touch with reality much of this past year" (Tr. 713). Treatment notes further indicate that the claimant would talk nonstop through behavioral health appointments (Tr., *e. g.*, 717, 730, 732, 754). She notes instances of helping at a Quinceanera and helping her mother around her house but concluding that both separate activities had exhausted her so that she could not work (Tr. 718, 725). Testing of the claimant in August 2013 revealed both severe depression and severe anxiety (Tr. 726). In October 2014, Ms. Heinemann asked the claimant if she needed hospitalization, but the claimant reported no plans to harm herself or others (Tr. 759).

On January 9, 2015, the claimant was again hospitalized for 10 days at Parkside for depression with suicidal contemplation and frequent panic attacks and was discharged with moderate improvement (Tr. 584-585). Her discharge diagnosis on Axis I was major depressive disorder, recurrent, severe, with psychotic symptoms, and PTSD (Tr. 584). Her discharge instructions included continued treatment with her therapist, as well as continuation of psychotropic medications (Tr. 585). Treatment notes stated she mentioned her previous hospitalization in 2013 and that she believed she should have stayed then because she had not been ready to leave (Tr. 587). Following the second hospitalization, the claimant again was positive for anxiety and depression through much of 2015 (Tr. 660-679, 699).

In October 2016, the claimant's father passed away, and treatment notes indicate that she did not seem as upset as when her dog was hit by a car, but that they did need to discuss her medications for depression despite the fact that she was not keeping her mental health appointments (Tr. 831). On January 9, 2017, the claimant reported her depression

was controlled with medications, but that she "feels flat" and not interested in anything, was irritable, fussy, angry, and cried easily (Tr. 859). She also reported lack of energy, fatigue, and daytime sleepiness (Tr. 859).

On June 9, 2015, Ms. Heinemann completed a number of forms regarding the claimant's mental impairments and ability to work. She indicated that the claimant has difficulty being around others and has frequent panic attacks which cause her to be physically ill or aggravates her chronic illness, and that she prefers to be with animals (Tr. 821). She further indicated that the claimant was hyper-vigilant, had flashbacks, dwells on traumatic events from the past, and was uncomfortable around people, especially those who precipitated flashbacks and/or panic attacks (Tr. 822). She checked boxes indicating, *inter alia*, that the claimant could not understand, remember, or carry out even simple instructions, make simple work-related decisions, or handle normal work stress in a routine work setting (Tr. 822). She also noted that the claimant has periods of regression where she cannot get out of bed (Tr. 823). She checked more boxes indicated forty-nine signs and symptoms, including that the claimant had difficulty thinking or concentrating, persistent disturbances of mood or affect, emotional withdrawal or isolation, and deeply ingrained, maladaptive patters of behavior (Tr. 824). When asked about abilities to do unskilled work, she indicated that the claimant either had no useful ability to function or was unable to meet competitive standards in all categories (Tr. 825). She also wrote that the claimant preferred to do things her way, could not take direction from others, and prefers to be alone (Tr. 826). She also indicated that the claimant would be absent from work more than four days per month (Tr. 827).

-7-

Dr. Jimmie Taylor conducted a physical examination of the claimant on March 31, 2016. He found that, psychologically, she had major depressive disorder, chronic fatigue, anxiety, and fear of being in public, and recommended, *inter alia*, a psych consult (Tr. 799). Dr. Theresa Horton, Ph.D., then conducted a diagnostic interview and mental status examination on August 9, 2016 (Tr. 812). She observed that the claimant's overall MoCA score was within normal limits, and that she exhibited appropriate judgment but had very poor insight (Tr. 815). She diagnosed the claimant with unspecified personality disorder with prominent cluster B/dependent personality traits, unspecified mood disorder with anxious and depressed features, and referred to the medical records for the physicians' diagnoses (Tr. 815). She opined that the claimant appeared capable of understanding, remembering, and managing many simple and complex instructions and tasks, but that she appeared to have long term and persistent traits that likely do interfere with her ability to persist on task and adjust socially with coworkers, as well as cope with the typical stressors of daily life/employment on a regular basis. She further noted that, rather than improving in skills with therapy, the claimant appeared to have regressed and become more dependent, developing a strong belief system that she was unable to function at all anymore, which "can't do it" self-defeated belief system appeared to be a strong indicator of a poor prognosis. Dr. Horton further noted that the claimant would not adjust to areas that were fast paced and/or densely populated and would benefit most from cognitive behavioral therapy (Tr. 815).

State reviewing physicians determined that the claimant was markedly limited in the ability to understand and remember detailed instructions, carry out detailed instructions,

and interact appropriately with the general public, and that she was further moderately limited in the ability to work in coordination with and proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting (Tr. 310-312, 342-344). They concluded that the claimant retained sufficient concentration, memory, and general cognitive abilities to understand, remember, and carry out simple tasks involving objects and/or non-complex data with routine supervision, and retained the capacity for concentration, persistence, and pace for one- to three-step instructions for two-hour periods over an eight-hour day through a week for forty hours. Additionally, they found that the claimant retained adequate social skills to respond/relate appropriately to supervisors and co-workers on a superficial work basis and to perform work where interactions with others is incidental to work performed, was limited to work situations that do not involve interaction with the general public due to her anxiety impairment, and was aware of basic hazards and could adapt to a lower stress work environment that does not involve numerous changes in daily routines or work duties (Tr. 312, 344).

In his written opinion, the ALJ summarized the claimant's testimony and much of the medical records. In discussing the opinion evidence, the ALJ summarized Dr. Horton's report and stated that Dr. Horton found the claimant was capable of understanding, remembering, and managing many simple and complex instructions and tasks and that she could not adjust well to fast-paced environments, then gave "considerable weight" to her opinion without further discussion of Dr. Horton's remaining recommendations (Tr. 251-253). The ALJ then gave no weight to Ms. Heinemann's opinion, stating that it was not

consistent with her treatment records and the claimant's admitted activities (Tr. 253). Additionally, the ALJ summarized the findings of the state reviewing physicians, as to her mental impairments. He gave "little weight" to those opinions, stating without evidentiary support that he had determined that the claimant's mental status had improved (Tr. 253). The ALJ found the record consistent with the assigned RFC because the most recent record from January 2017 stated that the claimant's depression was well-controlled with medication, that she had stayed with a lady and cleaned dog kennels for room and board from 2014-2015, that the claimant reported being a caregiver for an infant in August 2016, and that Dr. Horton found she was capable of remembering, understanding, and managing many simple and complex instructions and tasks, and would not adjust well in fast-paced areas (Tr. 252-253).

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional. . . . An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) [internal citation omitted], *citing Goatcher v. United States Department of Health & Human Services*, 52 F.3d 288, 290 (10th Cir. 1995). The pertinent factors are: (i) the length of treatment relationship and frequency of examination; (ii) nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which

an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003), *citing Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). Here, the ALJ provided a summary of some of Dr. Horton's examination findings, but when he was discussing his RFC assessment, he only referred to a portion of her findings – those indicative that the claimant was capable of work. He completely ignored the statements immediately following, which call into question the claimant's ability to persist on task, adjust socially, and cope with work stressors on a regular basis, and further did not address Dr. Horton's assessment that the claimant had regressed in treatment rather than improved and that her mental impairments had created a belief system that contributed to a poor prognosis. The undersigned Magistrate Judge finds that such picking and choosing, particularly while purporting to assign "some weight" to Dr. Horton's opinion, is inappropriate and indicates a failure to conduct the proper analysis. *See Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability.").

Additionally, Social Security regulations provide for the proper consideration of "other source" opinions such as the one provided by Ms. Heinemann. *See, e. g., Frantz v. Astrue,* 509 F.3d 1299, 1302 (10th Cir. 2007) (noting that other source opinions should be evaluated with the relevant evidence "on key issues such as impairment severity and functional effects" under the factors in 20 C.F.R. §§ 404.1527, 416.927), *quoting* Soc. Sec. Rul. 06-03p, 2006 WL 2329939 at *3, *6 (Aug. 9, 2006) ("[T]he adjudicator generally

-11-

should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."). The factors for evaluating opinion evidence from "other sources" include: (i) the length of the relationship and frequency of contact; (ii) whether the opinion is consistent with other evidence; (iii) the extent the source provides relevant supporting evidence; (iv) how well the source's opinion is explained; (v) whether claimant's impairment is related to a source's specialty or area of expertise; and (vi) any other supporting or refuting factors. *See* Soc. Sec. Rul. 06–03p, at *4–5; 20 C.F.R. § 404.1527(c), 416.927(c). The ALJ noted at the outset of step four that he considered the opinion evidence in accordance with SSR 06-03p but failed to perform the proper analysis in his one-sentence rejection of her opinion. *See, e. g., Anderson v. Astrue*, 319 Fed. Appx. 712, 718 (10th Cir. 2009) ("Although the ALJ's decision need not include an *explicit discussion* of each factor, the record must reflect that the ALJ *considered* every factor in the weight calculation."). Here, the ALJ asserted without explanation that her MSS was not consistent with treatment records, and completely ignored Ms. Heinmann's assessment in light of the claimant's diagnoses, their treatment relationship, and her observations of the claimant. *See, e. g., Clifton*, 79 F.3d at 1010 ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.") *citing Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984). This analysis was particularly important here because Ms. Heinemann was the claimant's treating counselor

for much of the time period at issue, and her opinion is the only one in the record from a treating provider, albeit a treating "other source" provider.

Because the ALJ failed to properly consider the consultative and "other source" opinions, the decision of the Commissioner should be reversed and the case remanded to the ALJ for further analysis. If such analysis results in any changes to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether she is disabled.

## Conclusion

The undersigned Magistrate Judge hereby PROPOSES a finding by the Court that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. The undersigned Magistrate Judge thus RECOMMENDS that the Court reverse the decision of the Commissioner and remand the case for further proceedings. Any objections to this Report and Recommendation must be filed within fourteen days. *See* Fed. R. Civ. P. 72(b).

**DATED** this 3rd day of September, 2019.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**